and we'll go to the next case on the argument calendar Hager v. United States. Whenever you're ready, counsel. Good morning, your honors, Jason Kelly, or may it please the court, Jason Kelly for the plaintiff's appellants. Excuse me. I'm going to try to reserve some time for the end because, well, I'm going to try to reserve some time for the end. We have, as the panel is aware, this is a rule, an application of Rule 56, and both at the trial level and I think in the papers, there's a concession, there has to be a concession that the triage nurse at issue in this case did not perform the proper mental health assessment. And if a proper, our testimony is, our evidence is that if a proper mental health assessment had been done on Ed Hager, he would have been classified at a higher risk level. And because of that higher risk level, one of two things had to happen. Either refer him directly to a provider that day or at a minimum advise a higher level provider of Ed's situation and his needs. And if he had, and we have Dr. He was in fact referred to a higher level provider just in 30 days, but he was. Well, so, and this is where we can't, there's a lot of words being sliced and diced and frankly being interpreted in favor of the US. The testimony, and I'll get to the regular triage nurse, Edward Shear's testimony in a bit, but the testimony is, if possible, have him seen that day. And the defense all along has been, he didn't need to be seen that day. When she was asked whether that was the standard of care, she said no. So this is where we start to get into, again, the slicing and dicing of words. She, the question was, is it, this is where we talk about making a referral versus passing it on to a provider. Neither one was done. And the third issue was, was he required to be seen that day? So I don't understand.  Excuse me. The defense was not, he was unable. I'm sorry. I was about to ask a question, but you cut me off. I'm sorry. You said there were three possibilities. One was a referral. What was the second? The one was a direct referral. The second was to give it to a higher-level provider to see if the higher-level provider wanted to see Ed. That's not the same. That's different than a referral, than an admin, yes. What do you mean give it to him? You mean go talk to a higher-level? The nurse should have gone to talk to a higher-level provider to ask whether the higher-level provider wanted to see the person? Correct. Okay. And the third issue, the third thing at issue is whether it's required to be seen that day. So we've put forth, he was not at the high level of risk. He wasn't, you know, coming in. In fact, Nurse Markey felt that there was a low level of risk, right? And our critique of that is that it wasn't a low level of risk. Well, but my understanding, am I wrong that I didn't recall that it was below the standard of care for her to have found it at a low level of risk? Am I remembering that wrong? Yeah, we have, and this is in Nurse Puchkor's transcript. This would be, so it's in the supplemental record at page 83, it's page 27 of Puchkor's depositions. Looking at the warning signs, I would have said, yes, she should have and or communicated to a provider to see him that day. Well, the fact that she would have doesn't mean that not doing it was below the standard of care. I think that's a problem in your presentation is that where do you say that an expert witness said that this was below the governing standard of care? Well, and I think this is addressed best by the Rule 56 standard and the case law that says we don't require magic words to set standard of care. The testimony taken as a whole is given these signs in that situation, he should have been referred. Now, if she said, given these signs in this situation, it's the standard of care of a reasonably prudent medical triage nurse to send him on, we wouldn't be here? I mean, I think the case law is pretty clear that the fact finder is to look at the, and we've got these words interspersed throughout. Should have, ought to, minimally competent, standard of care, what was the other one? And they're used nearly interchangeably without any precise definition by both defense counsel in the questioning, by the U.S. and its papers, and the trial court. So when you don't have a clear definition, it says she should have done it. There was no follow-up questioning. Well, is that what you would have done or is that what the standard of care requires? There was none of that. And, in fact, when asked, where do you get that information? This was on, I mean, it's a short deposition transcript. She said, I get that from the American Psychiatric Nurses Association. So, counsel, let me focus on this a little, and I'm going to bring this up with your friend. I think you have a pretty good argument that the district court erred in finding that the standard of care didn't require that a suicide risk assessment be performed for every patient at every appointment. And based on, but let's assume for the minute that I believe the district court erred in that finding. I'm still having trouble with causation. And the reason I'm having trouble with causation is even if the standard of care required that a suicide risk assessment be performed for every patient at every appointment, as your expert testified at SCR 85, where is that tied up with something, the standard of care required something to be done that day because Mr. Hager tragically killed himself that day? So if something hadn't happened that day, I don't see how there could be causation. But even if the standard of care required the suicide risk assessment be performed that day, how does that get to, and then something else would have happened that would have stopped him or could have stopped him from killing himself if there's nothing else that had to happen that day? So the assessment came back at low, the preliminary screening came back at low risk. And it's questions like, are you thinking of killing yourself?  There's issues with that. There were several, there were like three screening, three different screening questionnaires, right? Well, some of them were suicides. There were three different forms used, yes. And so if it was persistent about this, at least he said it more than once. And so if they had the full mental health assessment, we believe, and Nurse Pritchard says, look, based on what I've seen, if you do the full assessment, you rate him at a higher risk. What does she say that if there were I mean, that's another causation question is a different one from the one that Judge Bennett was identifying. Did she say that if you had done a full assessment, he would have been rated at higher risk? She says what she says is based on what I'm seeing here. I can tell you he's a higher risk. And if you had done the larger thing here, what does that mean? Things such as I don't want to be alone. I'm in my own head. I can't sleep. I'm asking for help. Well, she said, I mean, actually, that's the part of the record that troubles me the most. She did say all those things to the to the nurse, and she didn't regard that as putting him at a higher risk. And that kind of bothers me a lot. But but but since he already said those things, what would have been different if he had done a formal risk assessment? If she had done the proper risk assessment, he would have come back at a higher risk. And then the algorithm should follow that fact. In terms of a contested fact, we can rely on on the expert witnesses testimony. Where is that? There's. The first place, the one that Dr. Our causation expert, Dr. Joyner, says based on what he's the assessment he did, he was at a moderate risk. We also know that. And we also know that if he was classified at a higher risk, even the defense expert nurse, Giacomo, if I'm pronouncing that properly, Giacomo would have also referred him. So the question is, was the low risk assessment a standard of care breach or not? OK, but counsel, getting back to my question, you're Dr. Joyner, PhD, said if he had been able to talk to the counselor that day, it is far more likely than not that he would not have attempted suicide that day. And my question is, even if the standard of care required that a formal suicide risk assessment be performed by nurse Markey, where is the testimony that that would have meant that he would have seen anyone else that day? Understood. So are OK. Your Honor, we are arguing that if the formal, the more thorough mental health risk assessment had been done properly. Now, granted, we have to assume it was properly done. Then he would have come back at a higher risk. So by not performing the assessment, given the indicators that we do have, the risk was undervalued. OK, counsel, where in the record does somebody testify that even if the suicide risk assessment had come back at a higher level, he would have, the standard of care would have required that he see someone else that day? Point me to a place in the record where someone said that. The problem is we can't perform that assessment because it wasn't done and he's not here. But Dr. Joyner, for example, essentially made that determination, but not in a way that's helpful to you, because he said that what he knew indicated a suicide risk level that is at least of moderate degree. And then he said that there had to be caring follow up within hours to days. Then he said there had to be ample encouragement to visit a physician within hours to days. And then reference the day of the visit to principles of behavioral activation that can be instituted immediately, like going for walks in the woods and stuff. And that's it. So he didn't, he who was the causation expert, didn't say that if there were a moderate degree of risk, that he would have to see somebody that day. He said hours to days. That is correct, Your Honor. And go back to, I think it's his first paragraph or first sentence. This is a cry for help. Get him to see someone within hours or days. Let him know that someone cares. Well, the 30 days, I mean, 30 days out certainly seems extremely troublesome, but it wouldn't have made a difference. That's the problem here. If it hadn't been that day, nothing would have helped. Right. And, well, if that day he had been given something more, then go home to your empty house with your empty head and your dark thoughts and your guns and promise to give them away and come see me in a month. Well, she did say he should give the guns away, and he did purport to do that, although obviously he didn't give them all away. That's why family members are needed to help. Well, this was family members, right? I thought that's who he gave the guns to, but not all of them. Exactly. So there's a difference between the guilt and the shame of going to your in-laws and saying you need to take this form. But he did it. He did do that. So that's another causation problem because that may have been a bad idea, but he did it. And so whether that was a good or bad idea wasn't the cause of the problem because he did it, but he apparently kept a gun back. These are all fact arguments, Your Honor. That's my point. No, it's not a fact argument. It's a non-contested fact that he did it. Well, our contention is he withheld from his in-laws because he was shown a lack of care by the people who tasked with helping him. But you can't point to the gun, the fact that she didn't at least try to do something about the guns, which actually the biggest barrier to which was the embarrassment, but he did it anyway. Right. So, again, that's where the intervention of the medical provider calling your in-laws is superior to promise me you'll do it. Counsel, you don't have much time left. We'll give you a little bit more time, but would you like to reserve? I'd like to reserve. Thank you. And we'll give you some extra time. Thank you. Appreciate it. Good morning, Your Honors. May it please the court, Kathryn Branch on behalf of the United States. I think importantly in this case, plaintiffs mistake the facts. They misframe the issues before the court, and they seek to have this court decide an issue of causation that was not before the district court. They also raise new arguments, and there were reply brief that were not presented in their opening brief or raised before the district court, specifically their argument regarding institutional liability. The way that plaintiffs present the issue before this court is whether the trial court aired in ruling as a matter of law that there was nothing the substitute triage nurse could have done to give Ed Hager a chance not to die from suicide. That is not the issue before this court. Rather, the district court properly granted summary judgment to defendant because plaintiffs failed to offer expert testimony that the provider whose care was at issue, Nurse Markey, violated the standard of care applicable to a registered nurse board certified in psychiatric and mental health nursing. Well, the district court found there was tribal issue as to one.  All right. So I want to focus on a different one where I have a problem with what the district court did. So I'm looking at SCR 85. And the issue was the testimony, the standard of care requires that a suicide risk assessment be performed for every patient at every appointment. And then there was a question at the depot, where does that derive from? And the answer is the American Psychiatric Nurses Association. And then the question is essentially, well, does the American Psychiatric Nurses Association, fairly read, say that that's a requirement or a best practice? And the answer is best practice. So to me, that doesn't cut against her testimony that it's part of the standard of care. I mean, I'm not familiar with the American Psychiatric Nurses Association's publication, but I am familiar, for example, with the American Psychiatric Association. And if somebody were to say, was it below the standard of care? Yes. Where did that derive from? It derives from the DSM-5. And in the DSM-5, is it part of the standard of care? No. What does that matter? If it's derived from something, why would it matter whether or not what it's derived from describes it as a standard of care? Because she testified it's a violation of the standard of care. And the question was, where does that derive from? And that's what the district court relied on. And I don't see that as correct. Why am I wrong? Well, I think that Nurse Puchker's testimony was equivocal in many respects. And so she did initially testify that the standard of care required the suicide risk assessment be performed. And then, as you correctly note, I asked her where that standard derives from. Because much of what she testified to was really, in effect, her personal practice. And so she identified the American Psychiatric Nurses Association as where that standard derives from. But when pressed on it, she admitted that that was not something that the American Psychiatric Nurses Association requires. Was this all in a discussion about the risk assessment? I'm sorry? Was this all in a discussion about the risk assessment requirement? Yes. So are you contesting whether there was at least a tribal issue of fact on the risk assessment, which is what the district court found, right? We're not contesting. We believe that the district court correctly found that the plaintiffs failed to introduce evidence that performing the suicide risk assessment was a breach of the standard of care. Because Nurse Puchker's testimony was the standard of care does not require it. It is a best practice outlined by the American Psychiatric Nurses Association. Okay. Why don't you hypothetically assume that we might decide the district court was wrong on that? Why wouldn't that then get to the jury on the issue of causation? Well, even if the suicide risk assessment had been performed in – and I don't concede that it was not performed. Nurse Markey, in her interaction with Mr. Hager and her review of the medical records, noted the things that would have been taken into consideration in a suicide risk assessment. She didn't chart necessarily in the way that outlines the suicide risk assessment. Somebody says that he isn't sleeping and that he essentially can't function when his family is away for two weeks. It's not terribly useful to set a psychiatrist's appointment in a month. And it does appear that she was at least not paying close attention to what he was saying. Well, I think, Your Honor, if you look back, and Plaintiff's raised this below, at the really the only other – He said specifically he hadn't slept in days. He did say that. But I think that, one, there is a difference between a chronic risk of suicide and an acute risk of suicide. This is something that was outlined by defendants expert Dr. Berman in his report. Just because Mr. Hager may have had risk factors that elevated his chronic or lifetime risk of suicide does not mean that he was at an acute, a medium, an intermediate, or a high acute risk of suicide on the day that he was seen at the VA. He was still at a low risk of suicide that day because he had not engaged in any preparatory behaviors. He did not endorse suicidal ideation. He didn't have a plan. He didn't indicate that he had any intent. And, in fact, no separately than nine times during that appointment, he denied that he was suicidal. But if you look at the appointment that he had at the VA in June of 2013, which is at SER 213, 213 through 21 – Didn't the district court determine that on the mental status assessment there was a breach of the standard of care? I mean, there was at least a tribal issue of fact in that question?  But you said before not. You said the opposite just before. Well, I'm sorry. The mental – there are two different assessments at issue. The mental status assessment, which looks at whether Mr. Hager is oriented to time and place. Is he displaying an appropriate affect? Does he know the date and who the president is? That is the mental status assessment. The suicide risk assessment is a different assessment. They were presented as two different breaches of the standard of care. The trial judge said, one, there's a tribal issue. The other, there isn't.  So going back to the note from June of 2013, where the district court identifies that a suicide risk assessment has been done by the provider at that time, which was six years prior to when Mr. Hager presented in 2019. Despite the fact that he at that point had perhaps more factors that were indicative of a suicide risk, he was assessed to be at low risk of suicide. This is at SER 219. Desire or capacity alone, infrequent, low-intensity, vague suicidal ideation exists, but there is no subjective or objective evidence of intent or plan. And a willingness to engage in treatment. And I think that if taken as a whole, there is nothing about Mr. Hager's presentation in 2019 that is fundamentally different, such that even if the court were to find that it was a breach of the standard of care not to have documented a suicide risk assessment, that the suicide risk assessment in 2019 would have come out any differently than the suicide risk assessment in 2013. But maybe it's not a very good risk assessment. That is to say, it seems to me that the nurse, Nurse Markey, was in fact concerned about his suicide risk because she asked about guns and she, you know, talked to him about his situation and going home and, you know, he's a troubled man and maybe he's saying these things to please her rather than, you know. I mean, I'm just thinking, isn't this a jury question of whether or not she had concern about his immediate risk or acute risk of suicide by the way she spoke to him and advised him? I don't think so, Your Honor, because if you look at her declaration, she is an experienced mental health nurse. She says, I have certainly had occasion in the past where somebody is telling me, no, I am not suicidal, no, I don't have these feelings, no, I don't have a plan, and I just don't believe them. I am picking up something underneath the surface that is telling me that this person is at risk, and she did not have that with Mr. Hager. As Judge Bennett requested, suppose we disagreed with all that. What about the causation issue? So you can't divorce causation from the breaches of the standard of care. And so as to the – well, Nurse Kutschgers initially outlined many possible breaches of the standard of care and when pushed was unable to say that those were breaches. And I think it's important to note that even Nurse Kutschgers admits that based on what is in the record, there is no reason to believe that he was at anything other than a low risk of suicide. But assuming that Nurse Markey breached the standard of care by not conducting the mental status assessment, time, place, that sort of thing, there's no indication that that breach caused Mr. Hager's suicide. Similarly, even with the suicide risk assessment, I think that the evidence – the unrefuted evidence really in the record indicates that even if that had been done, there is no evidence that his suicide risk would have been established to be anything other than low. But isn't – what is mystifying me is it seems to me that the hardest part of this case for the plaintiff to get over is the fact that he actually committed suicide the next day. So, therefore, the causation has to establish that if the suicide risk assessment had been done, that something would have been different in that time period. And that's true, Your Honor. And I think that they can't get there because even their own expert says that, well, he should have been referred to someone within hours or days. And so there is nothing in the record to indicate that Mr. Hager was in need of immediate hospitalization, that he could not be trusted to take care of himself, that he didn't understand what was going on. In fact, he was seen by his mother and stepfather for several hours later that evening, and they perceived no change in his behavior or his mental health. They had no concerns about him at that time. And so if a plaintiff's causation expert says that he should have been seen within days of this appointment or an appointment should have been set sooner than 30 days out, but that doesn't get them over the hump of the fact that Mr. Hager committed suicide shortly after this appointment, really to the shock of everyone. But wouldn't it be a jury question, for example, if doing the suicide risk assessment would have required somebody else be consulted? And even if they had said to him, you know, we have a concern, Mr. Hager, you're going to see somebody in two days. We have a concern. Wouldn't it be a jury question as to whether or not that extra level of concern expressed to him, even if it wasn't going to be that day, might have been a substantial factor, which is the Arizona test, as I understand it, in causing the harm? Are you referring to the loss of chance or are you referring to a substantial factor? Substantial factor, just that he would have been told, you're going to be seeing somebody in a couple of days, we have a concern, but you're going to see somebody in a couple of days because we have a concern. Isn't there tribal, aren't there facts that could suggest to a jury that if he had been told that, that might have caused him not to kill himself, unless there was a substantial factor that he wasn't? No, Your Honor, I don't believe that that is accurate. Mr. Hager was offered resources at the Veterans Center. He said that he intended to go the following day and follow up with counselors there, and yet he still committed suicide at some point in the following 24 hours. And so I don't believe that there is any evidence, disputed evidence in the record that would suggest that if he had been told that, it somehow would have stopped him from committing suicide or that it would have decreased the chance of his having committed suicide. If Your Honors have no further questions, we ask that the district court's decision on summary judgment be affirmed. All right, thank you, counsel. We'll give you two minutes for rebuttal. Thank you, Judge. I'd like to follow up on Your Honor's last line of questioning, because what he was told was he said, I need to see someone today. Did he say that? Yeah, he said, I want to talk to someone today. That's in the record. That's, I mean, Nurse Markey wrote that down. And what he was told was, no, not today. But here's someone else you can talk to. That's not answering the cry for help, and that's the jury question. And I think Your Honor hit it on the head. I just wanted to explain a little further. We know, well, there is evidence that there was the assessment was improperly performed and mistakenly, the assessment that was done was improperly performed. We don't have the entirety of the assessment, and it's not recorded, so we can't guess as to what was done. But it's very likely, if the full assessment had been done, that's the point. It would have shown other factors that would have got him in. And this is a question. It's in the transcripts of Nurse Putsch's course. She, I mean, more than once, she said there was enough here to see a higher-level person. SCR 87, she says, there's a concern about safety and outside the scope and standard practices of a registered nurse. Same page, there were risk factors and warning signs that she should have communicated to someone. These are jury questions, and if he had been told, you will see someone within hours, or as Your Honor points out, if he was told, you know, we can't get you in for 48 hours, but let's walk through this until you can see a higher-level provider, that's answering the cry for help. And at a minimum, it's a jury question.  Thank you, counsel. We thank both counsel for their arguments, and the case just argued will be submitted.
judges: BERZON, BENNETT, Lefkow